******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* DAVID GRANT
(AC 39921)

DiPentima, C. J., and Lavine and Elgo, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of manslaughter in the first degree with a firearm and assault in the first degree in connection with an incident in which the defendant shot two witnesses at a restaurant, the defendant appealed. During the defendant's trial, the court admitted into evidence a digital video recording of an interview of the defendant by the police following his arrest and a written statement in which the defendant had admitted to being the shooter and that he sold drugs to make money. The state also presented forensic evidence and testimony from various eyewitnesses, including V, who testified, inter alia, that he had personal knowledge that the defendant sold drugs and had possessed a firearm prior to the time of the shooting. Following V's testimony, the trial court gave a limiting instruction to the jury regarding prior misconduct evidence. On the defendant's appeal, *held*:

1. The defendant could not prevail on his claim that the trial court abused its discretion in admitting V's testimony and the portions of the defendant's statements to the police that indicated that he was involved in the sale of drugs, as any alleged error in the admission of that evidence was harmless: the defendant failed to demonstrated that the admission of the subject evidence had a significant impact on the jury's verdict, as the state's case against the defendant was strong, the state having presented an abundance of independent evidence that substantiated the jury's verdict, including eyewitness testimony identifying the defendant as the shooter, forensic evidence indicating that a firearm recovered near the restaurant fired the bullets that were recovered from the victims' bodies, documentary and testimonial evidence that the defendant's DNA was present on that firearm and the written and recorded statements made by the defendant, in which he admitted his involvement in the shooting and the manner in which it transpired; moreover, the evidence that the defendant sold drugs was not a prominent part of the state's case or more egregious in nature than the evidence related to the shooting incident, the record was barren of any evidence that contradicted V's testimony and the court provided the jury with a limiting instruction regarding prior misconduct evidence immediately following V's testimony.

2. The defendant's claim that the trial court abused its discretion in permitting the state to elicit testimony from V that he had observed the defendant carrying a firearm on a prior occasion was unavailing, as any alleged error in the admission of V's statement was harmless; in light of the various factors discussed in this court's analysis of the defendant's first claim, this court was left with a fair assurance that the admission of V's statement did not substantially affect the jury's verdict.

Argued October 17, 2017—officially released January 2, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder, assault in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of New London, geographical area number twenty-one, where the first and second counts were tried to the jury before *Jongbloed, J.*, and the third count was tried to the court; verdict and judgment of guilty of the lesser included offense of manslaughter in the first degree with a firearm, assault in the first degree and criminal possession of a firearm, from which the defendant appealed. *Affirmed.*

*Daniel J. Foster*, for the appellant (defendant).

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, David Grant, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a, and assault in the first degree in violation of General Statutes § 53a-59 (a) (5).[1] On appeal, the defendant claims that the trial court improperly (1) admitted evidence of his involvement in the sale of drugs and (2) permitted the state on redirect examination to inquire as to whether a witness had observed the defendant carrying a firearm on a prior occasion. We affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. At approximately 1:40 a.m. on June 24, 2012, a 911 dispatcher with the Norwich Police Department received reports of a shooting at the Mai Thai restaurant and bar in Norwich (establishment). Officers Steven Schmidt and Patrick Lajoie, who were investigating a complaint at an American Legion hall located approximately one third of a mile from the establishment, responded to an emergency dispatch. They arrived moments later and encountered a chaotic scene as patrons fled the establishment. Schmidt entered the building and immediately discovered an unresponsive female, later identified as Donna Richardson, lying in a pool of blood on the floor. Richardson was transported by emergency personnel to the William W. Backus Hospital, where she was pronounced dead. Following an autopsy, the medical examiner determined that her cause of death was a gunshot wound to the chest and that the manner of death was a homicide. While conducting that autopsy, the medical examiner removed a projectile from Richardson's body and gave it to a detective with the Norwich Police Department, who packaged it as evidence.

A second patron at the establishment, Crystal Roderick, suffered a gunshot wound to her right thigh. Although she heard gunshots, Roderick did not see her assailant. Roderick was transported from the establishment to the William W. Backus Hospital, where medical personnel determined that a bullet was lodged in "a very superficial location" in her thigh. A surgeon later removed the bullet, which was secured by members of the Norwich Police Department.

On the night of the shooting, both Richardson and Roderick had attended a high school graduation party held in a private room at the establishment. Roderick testified that, later in the evening, "[t]here [were] a lot of people" at the establishment, including the defendant and a person known as Steven Velez, whom she identified as "Cuda." Approximately fifteen minutes before being shot, Roderick had a conversation with the defen-

dant, whom she described as a friend, on a deck at the rear of the building that served as the main entrance to the establishment. During that conversation, Roderick exchanged phone numbers with the defendant, who "smelled like he was drinking."

Ashleigh Hontz was at the establishment that evening with her mother to celebrate a friend's birthday. Hontz saw the defendant and Velez together, both of whom she previously had known, and remarked to her mother that she found the defendant's attire unusual for "what you wore out at night," particularly because she had seen the defendant in the same attire at a retail store earlier that day. When "last call" was announced at approximately 1:30 a.m., Hontz retreated to her vehicle in a parking lot by the deck. She heard a scuffle on the deck and then observed the defendant and Velez descending its stairs. At that time, Hontz watched as the defendant "pulled a gun up with his right hand and fired . . . [s]traight up into the deck aimlessly, it looked like." She continued to observe the defendant as he walked to the front of the building and entered a vehicle driven by Velez, which "drove away fast."

In his testimony at trial, Anthony Zemko provided a similar eyewitness account. Zemko arrived at the establishment sometime before 1:30 a.m. to pick up a friend. He parked his vehicle directly across from the deck and waited while "facing directly to the back of the building." Zemko then saw two men coming down the stairs of the deck when the second one "lost his balance a little bit and fell over to the railing. . . . [H]e didn't fall completely. He stumbled into the stair rail and handrail, and something fell out of his waistband . . . . It landed on the ground and made a bang with a flash." Zemko testified that the item appeared to be a pistol, and continued: "That gentleman picked the pistol up, put it in . . . his right pocket [and] began walking away . . . . [He] then spun around and took the gun out and just pointed at the crowd [on the deck] and started shooting." Zemko testified that the two men then fled in a speeding vehicle. When the police officers arrived at the establishment moments later, there were approximately thirty to fifty people on the deck.

Norman Tonucci was working as a groundskeeper at the Mohegan Sun casino on June 24, 2012. Approximately six hours after the shooting, Tonucci discovered a firearm on top of a bed of mulch by the entrance to the casino. Law enforcement officials also recovered spent shell casings from the establishment and ammunition found in front of the American Legion hall located a short distance from the establishment. The firearm, shell casings, and ammunition were compared with the projectiles removed from the bodies of the two victims by Jill Therriault, a firearms and toolmark examiner with the state Department of Emergency Services and Public Protection's division of scientific services. In her

report, which was admitted into evidence, Therriault concluded that the projectiles and shell casings were associated with the firearm. She also testified at trial that the projectiles recovered from the victim's bodies both were fired from the firearm recovered near the Mohegan Sun casino. In addition, DNA samples were extracted from the firearm. Subsequent forensic testing revealed multiple contributors. Although Velez was not "a source of or contributor to" any of the DNA samples, the defendant was included as a contributor to one of the samples. At trial, Dahong Sun, a forensic examiner at the state forensic science laboratory, testified that the expected frequency of individuals who could be a contributor to that particular sample was "less than one in seven billion in the African-American, Caucasian, and Hispanic populations."

Velez also testified at the defendant's criminal trial. At that time, he was incarcerated and had multiple charges pending against him. Velez testified that he was a drug dealer and had moved from New York to Norwich to make money "[s]elling drugs." On the night of the shooting, Velez had been drinking alcohol with the defendant at a friend's house. Sometime around midnight, they headed to the establishment. When the lights later came on at the bar to indicate that it was closing, Velez exited through the deck at the rear of the building. Velez testified that he then heard gunshots and ran to his vehicle, which was parked at the front of the building. When the defendant then appeared around the corner, Velez told him to get in the vehicle, and they quickly departed. Velez testified that he asked the defendant what had happened, and the defendant replied that he had fired shots after seeing "Zay," an individual also known as Isaiah Lee. Velez testified that the defendant had a gun in his hand when he entered the vehicle. As they drove away, the defendant "threw some bullets" out the window and later tossed the gun "somewhere" along the highway. When the defendant received a phone call informing him that someone had been shot, the two proceeded to Brooklyn, New York, where they parted.

Several months later, the defendant was arrested in Maryland as a fugitive from justice and agreed to be extradited to Connecticut. During the trip to Connecticut, officers from the Norwich Police Department advised the defendant of his *Miranda* rights[2] and proceeded to question him about the shooting. Because the audio recording equipment in the vehicle was not working properly, the officers conducted a second interview upon returning to Norwich. At that time, the defendant provided a written acknowledgement of his *Miranda* rights. In the interview that followed, the defendant admitted to being the shooter at the establishment on June 24, 2012. A digital video recording of that interview was made, which was admitted into evidence and played for the jury at trial. The defendant also

provided a written statement to the police, which also was admitted into evidence.

In those statements, the defendant indicated that he arrived at the establishment approximately thirty minutes before closing time on the night of the shooting. He had been drinking heavily and was "wasted" at that time. When he was on the dance floor, Velez approached him and handed him a revolver while noting that Zay was across the room. The defendant acknowledged that he did not "know Zay too well, but I know he goes around shooting at people" and had shot at both Velez and another friend in the past. As Velez and the defendant headed to the deck area, the defendant observed that Zay "was standing there like he did have a gun" and was "moving around like he was getting ready to do something."

In his statements to the police, the defendant indicated that Velez then told him that he was going to start his vehicle. At that time, the defendant fired a shot in Zay's direction. When asked why he had fired that shot, the defendant stated, "I just got nervous and scared really."[3] The defendant stated that he was only trying to scare Zay and did not intend to kill him. As the defendant descended the stairs of the deck, he slipped and fell. While doing so, he fired another shot. The defendant then heard what sounded like another gunshot and fired a third shot in response. As he stated, "I heard some like—it sounded like a shot or whatever, and I just swung my hand back and shot. I didn't even look. I didn't even look where I was shooting really." The defendant also noted that "[i]f I was focused and more conscious, I probably would have just never did that—recklessly just shoot like nobody can't get hurt."

The defendant stated that he and Velez then fled to Velez' vehicle and drove away. From his passenger seat in the vehicle, the defendant removed the remaining bullets from the gun and tossed them out the window. Sometime later, the defendant threw the gun out the window, though he did not recall precisely where. When they later received a phone call informing them that someone had died as a result of the shooting, the two proceeded to Brooklyn. As the defendant put it, "[s]ince then, I've been on the run." At the end of his written statement, the defendant noted, "I didn't mean for that lady to get killed or for [Roderick] to get shot. I was just doing my thing out here. I sold crack cocaine to get by to feed my family. If it wasn't for [Velez] giving me that gun, I would have went home to my family that night."

The defendant subsequently was charged with murder in violation of General Statutes § 53a-54a (a), assault in the first degree in violation of § 53a-59 (a) (5), and criminal possession of a firearm in violation of § 53a-217 (a). A trial followed, at the conclusion of which the jury acquitted the defendant on the charge of murder,

but found him guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of §§ 53a-55 (a) (1) and 53a-55a.[4] The jury also found the defendant guilty of assault in the first degree. On the criminal possession of a firearm charge; see footnote 1 of this opinion; the court found the defendant guilty. The court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of forty-seven years incarceration, followed by ten years of special parole. From that judgment, the defendant now appeals.

I

The defendant contends that the court improperly admitted evidence that he was involved in the sale of drugs. Specifically, he claims that the court abused its discretion in admitting both Velez' testimony that the defendant sold drugs and the portions of the defendant's written and recorded statements in which he acknowledged that he "sold crack cocaine to get by to feed [his] family." In response, the state argues that (1) the court properly determined that the probative value of that evidence outweighed its prejudicial effect and (2) any error in its admission was harmless. We agree with the latter contention.[5]

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

The following additional facts are relevant to this claim. At a pretrial hearing, the state indicated that it intended to present evidence of prior bad acts on the part of the defendant—namely, that he "has engaged in the drug trade as a seller of drugs, and also that he has been known [to] unlawfully possess firearms before the shooting." The state further informed the court that such evidence primarily would be introduced through testimony by Velez. In response, the defendant objected to that evidence. After noting the defendant's objection, the court advised the parties that its ultimate ruling on

the admissibility of such evidence would be made "in the context of the evidence that has been received up to the point at which it is offered." The court at that time cautioned the state not to elicit any such testimony from witnesses at trial without first providing the court and the defendant an opportunity to properly address the issue.

On the second day of trial, the state complied with that admonition. Prior to Velez taking the witness stand and outside the presence of the jury, the prosecutor informed the court that he expected Velez to testify that the defendant was "engaged in the drug trade in the city of Norwich" and that the defendant possessed firearms prior to the night of the shooting. He argued that such evidence was material and relevant because "the fact that he's been previously engaged in the drug trade explains why he's here, why he's associated with Mr. Velez, why he carries a gun, all these things important to the state's case." In response, defense counsel argued that such evidence was irrelevant and prejudicial. The court disagreed, stating: "I do think under all the circumstances, at least as presented to this point, that it certainly does meet the standards for admissibility. I will find that it's relevant and material to the circumstances as outlined by the prosecutor, including motive, identity, intent, absence of mistake or accident, and to complete the prosecution story. I also find that the probative value outweighs its prejudicial effect and so I am going to permit the testimony." The court then advised the parties that it would provide a limiting instruction to the jury regarding any such prior misconduct evidence.

Velez thereafter testified on direct examination by the state that the defendant moved from New York to Norwich to make money selling drugs. On redirect examination, Velez testified that he had personal knowledge that the defendant sold drugs and possessed a firearm prior to 2012. When Velez' testimony concluded, the court gave a limiting instruction to the jury regarding prior misconduct evidence.[6]

Assuming, without deciding, that it was improper for the court to admit the aforementioned evidence, we nonetheless conclude that the defendant has not demonstrated that its admission was harmful. The state's case was quite strong. Multiple eyewitnesses to the shooting testified at trial. Hontz, who knew the defendant prior to the night of the shooting, identified him at trial as the shooter. The state also offered the testimony of Velez, who testified that the defendant was holding a gun when he entered Velez' vehicle immediately after the shooting and admitted that he had fired shots at the establishment. See *State* v. *Bouknight*, 323 Conn. 620, 627, 149 A.3d 975 (2016) (any error in admitting certain photographs into evidence harmless where, inter alia, multiple eyewitnesses testified regarding

shooting and at least one identified defendant as shooter); *State* v. *Rodriguez*, supra, 311 Conn. 91–92 (any error in admitting testimony harmless where, inter alia, multiple eyewitnesses testified to defendant's involvement in crime and incriminating statements); *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) (any error harmless where multiple eyewitnesses saw defendant point gun at time of shooting, flee scene, or confess). The state introduced forensic evidence indicating that the firearm recovered outside the Mohegan Sun casino fired the bullets that were recovered from the victims' bodies. The state also produced documentary and testimonial evidence to establish that the defendant's DNA was present on that firearm. Perhaps most significantly, the state also introduced the written and recorded statements made by the defendant, in which he confessed his involvement in the shooting and the manner in which it transpired.

In addition, the evidence that the defendant sold drugs was not a prominent part of the state's case. See *State* v. *Urbanowski*, 163 Conn. App. 377, 408, 136 A.3d 236 (2016), aff'd, 327 Conn. 169,    A.3d    (2017). Furthermore, "in terms of its impact, the evidence was not more egregious in nature than the evidence related to the incident in the present case." Id.; see also *State* v. *Allen*, 140 Conn. App. 423, 440–41, 59 A.3d 351 (uncharged misconduct evidence not unduly prejudicial when not more egregious than evidence related to charged misconduct), cert. denied, 308 Conn. 934, 66 A.3d 497 (2013). We also note that the record is barren of any evidence that contradicts Velez' testimony that the defendant was engaged in the sale of drugs. See *State* v. *Edwards*, 325 Conn. 97, 133, 156 A.3d 506 (2017) (absence of evidence contradicting testimony factor in harmlessness analysis).

Moreover, the court provided the jury with a limiting instruction regarding prior misconduct evidence immediately after Velez' testimony concluded. See footnote 6 of this opinion. Such instructions "about the restricted purpose for which the jury may consider prior misconduct evidence serve to minimize any prejudicial effect that such evidence otherwise may have had . . . . [I]n the absence of evidence to the contrary, we presume that the jury properly followed those instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 314, 977 A.2d 209 (2009).

In light of the foregoing, we conclude that the defendant has not demonstrated that the admission of the evidence that he sold drugs had a significant impact on the jury's verdict. The state presented an abundance of independent evidence, including eyewitness testimony, forensic analysis, and statements by the defendant, that substantiated the jury's verdict. Any error in the admission of the evidence that the defendant sold drugs, therefore, was harmless.

## II

The defendant also claims that the court abused its discretion in permitting the state, on redirect examination, to elicit testimony from Velez that he had observed the defendant carrying a firearm on a prior occasion.[7] As with the defendant's prior claim, that contention is evidentiary in nature and subject to a harmless error analysis. See *State* v. *Payne*, 303 Conn. 538, 558–59, 34 A.3d 370 (2012). The analysis set forth in part I of this opinion applies equally to this claim, and it would serve no useful purpose to repeat it. It suffices to say that, in light of the various factors discussed therein, we are left with a fair assurance that the admission of Velez' statement did not substantially affect the jury's verdict in the present case. See id., 559. Accordingly, any error in the admission of that statement was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also was convicted, in a separate count tried to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a). That count was predicated on the defendant's status as a convicted felon at the time of the underlying crime. In this appeal, the defendant does not challenge the judgment of conviction with respect to that count.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] In his police statements, the defendant indicated that he had been shot on a prior occasion and "wasn't about to get shot at again."

[4] General Statutes § 53a-55a provides in relevant part that "[a] person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ." The verdict form completed by the jury indicates that it found the defendant guilty of that offense.

[5] Because we agree that the alleged evidentiary impropriety was harmless, we do not address the issue of whether the trial court abused its discretion in admitting that evidence. See, e.g., *State* v. *Rodriguez*, 311 Conn. 80, 88, 83 A.3d 595 (2014) ("we need not address the defendant's other reasons in support of his contention that the testimony was inadmissible because, even if we assume, without deciding, that the trial court should have excluded the testimony, its admission was harmless").

[6] The court instructed the jury as follows: "Through the last witness who testified—that was Mr. Steven Velez—the state offered evidence of other acts of misconduct of the defendant, namely, narcotics trafficking and prior possession of a firearm. This evidence is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Such evidence is being admitting solely to show or establish the defendant's intent, motive for commission of the crimes alleged, absence of mistake or accident on the part of the defendant, and the complete story as presented by the prosecution.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues of, again, intent, motive, absence of mistake or accident, and the complete story as presented by the prosecution. On the other hand, if you do not believe such evidence or even if you do, if you find that it does not logically, rationally, and conclusively support the issues for which it is being offered by the state, then you may not consider that testimony for

any purpose.

"You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you because it may predispose your mind uncritically to believe that the defendant may be guilty of the offenses here charged merely because of the alleged other misconduct. For this reason, you may consider this evidence only on the issues of motive, identity, intent, absence of mistake or accident on the part of the defendant and the complete story as presented by the prosecution and for no other purpose."

[7] On redirect examination, the following colloquy occurred over the objection of the defendant:

"[The Prosecutor]: Ha[ve] you ever been aware of [the defendant] possessing a firearm before—

"[Velez]: Yeah.

"[The Prosecutor]: —June 24, 2012?

"[Velez]: Yeah.

"[The Prosecutor]: And ha[ve] you personally seen that?

"[Velez]: Yeah."

---