******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NOEL BERMUDEZ
(AC 41864)

Elgo, Moll and Devlin, Js.

*Syllabus*

Convicted of the crime of felony murder in connection with the shooting death of the victim, the defendant appealed, claiming, inter alia, that certain of the trial court's evidentiary rulings constituted harmful error that entitled him to a new trial, and that other evidentiary rulings by the court deprived him of his constitutional rights to present a defense and to confront witnesses. The defendant and his brothers, B and S, robbed the victim when he returned home at night after closing the bar that he owned. The defendant then shot and killed the victim. Twelve years later, A, the estranged wife of S, gave the police a written statement that implicated the defendant, B and S in the victim's death. A, who knew that the defendant, B and S were affiliated with gangs, delayed providing information to the police out of fear that the defendant and S would retaliate against her or her family. S, who had regularly abused A throughout their relationship, beat her on the night of the shooting and threatened to kill her mother. While the defendant was incarcerated on unrelated charges during the twelve years after the shooting, he instructed A to write intimate and salacious letters to him so that he could discredit her in the event that she were to testify against him. The trial court admitted evidence that the defendant and S were affiliated with gangs, and that A and her children had been relocated out of state multiple times after A gave her statement to the police. The court refused to permit defense counsel to introduce the letters into evidence, limited his inquiry into A's birth control practices and precluded him from cross-examining her about the termination of her employment. *Held*:

1. The trial court did not abuse its discretion by admitting into evidence A's testimony that the defendant and S were affiliated with gangs or that she and her children were relocated after she gave her statement to the police:

   a. Evidence that the defendant and S were affiliated with gangs was relevant and highly probative to explain why A delayed twelve years before informing the police about the victim's murder, as she testified that she deeply feared gang reprisals and was afraid for her safety and that of family members, the court carefully balanced the probative value of her testimony against its potential for unfair prejudice, the court's limiting instructions to the jury after A testified minimized the prejudicial impact of her testimony, and the court instructed the jury in its final charge that the purpose of her testimony was to show why she was afraid to disclose information about the murder or why she disclosed it at the time that she did; moreover, A's testimony was not cumulative in establishing that she feared the defendant, B and S, as S's threats and history of physical abuse of A was a distinct and separate basis for her fear, and evidence of the defendant's gang affiliation was pertinent to establish that her fear extended to the defendant and B, and illustrated the extent to which she feared retaliation by other gang members.

   b. Evidence of A's relocation was highly probative and relevant with respect to her delay in providing information to the police about the shooting, which was a central issue in the case, as the jury reasonably could have concluded that A's willingness to subject herself to the upheaval and disruption of moving herself and her children multiple times was credible evidence of her belief that she and her family were not safe; moreover, the probative value of A's relocation testimony was not outweighed by its prejudicial impact on the defendant, as the court restricted the prosecutor from referencing the state's witness protection program (§§ 54-82t and 54-82u), A testified without referencing the witness protection program or the phrase, "at state expense," and, although the prosecutor's use of the phrase, "was relocated," in closing argument to the jury was prejudicial to the defendant, it did not have the same unduly prejudicial impact as "witness protection program" or "at state expense"; furthermore, references to the witness protection program

were passive and infrequent, and the prosecutor did not exploit that evidence.

2. The trial court improperly refused to admit into evidence the letters that A wrote to the defendant but properly precluded defense counsel from questioning A about the termination of her employment and limited his inquiry of her as to her birth control practices:

a. Contrary to the defendant's assertion that the trial court's rulings violated his rights to present a defense and to confront witnesses, the defendant's claims were evidentiary, rather than constitutional, as the record demonstrated that he was afforded multiple avenues of impeachment in cross-examining A, who was the state's key witness, and that he took full advantage of that latitude by rigorously cross-examining her with respect to relevant lines of inquiry, most importantly, her fear of the defendant, B and S, and that he sought to undermine A's credibility through the testimony of other witnesses.

b. The trial court erred in refusing to admit into evidence the letters that A wrote to the defendant but the defendant did not satisfy his burden to establish that the error substantially affected the verdict and therefore was harmful; defense counsel took full advantage of the court's permission to provide the gist of the graphic content of the letters and was entitled to quote the nonsalacious details of the letters, counsel was afforded wide latitude in his cross-examination of A, which lasted one and one-half days and included examination about the veracity of her explanation for authoring the letters, the cross-examination of A sought to establish the defense theory that she was motivated to come forward to retaliate against the defendant and S for the ending of her relationship with S, and there was corroborating evidence that supported A's testimony.

c. The trial court did not abuse its discretion in refusing to allow defense counsel to examine A about the termination of her employment, as the reasons for the termination would have injected a collateral issue into the trial.

d. There was no merit to the defendant's claim that the trial court improperly restricted his ability to cross-examine A about her birth control regimen; the court allowed some inquiry into the topic but properly determined that further questioning was irrelevant because it would have inappropriately focused on a matter far too attenuated from the material issues in the case.

3. The defendant could not prevail on his claim that the prosecutor made numerous statements during closing argument to the jury that referred to facts not in evidence; the prosecutor's remark that A had testified consistently in previous proceedings was based on reasonable inferences to be drawn from the evidence and was a response to defense counsel's having highlighted a single prior inconsistency in A's testimony, the prosecutor's remark that the state had received no benefit from A's testimony was merely an inadvertent misstatement in reference to reward money that was disbursed by the governor's office for information about the shooting, as it was obvious from the context of the statement that the prosecutor meant to refer to evidence that the state's attorney's office did not provide any reward to A, the prosecutor's ambiguous statement about who was with A when she withdrew money from her bank account was not intended to suggest that A had testified consistently as to that fact at previous proceedings but that she had testified consistently as to that fact at the defendant's trial, the prosecutor's remark that A knew of the reward at the time of the prior proceedings was clearly an invitation for the jury to draw a reasonable inference from the fact that she knew of the reward before any proceedings had taken place, the prosecutor's remark that B had moved in with A, uninvited, to keep watch over her when the defendant and S were incarcerated was a reasonable inference that could be drawn from the evidence, and the record substantiated the prosecutor's statement that the letters A had written to S were a means to discredit her and was a proper summation of A's testimony about the letters.

Argued September 6, 2019—officially released February 18, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of murder and felony murder, brought to the Superior Court in the judicial district of Waterbury,

where the court, *K. Murphy, J.*, granted the state's motion to preclude certain evidence and granted in part the defendant's motion to preclude certain evidence; thereafter, the matter was tried to the jury; verdict of guilty of felony murder; subsequently, the court declared a mistrial as to the charge of murder and dismissed the charge of murder; judgment of guilty of felony murder, from which the defendant appealed and the state, on the granting of permission, appealed; thereafter, this court dismissed the state's appeal. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Don E. Therkildsen, Jr.*, and *Cynthia S. Serafini*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Noel Bermudez, appeals from the judgment of conviction, rendered after a jury trial, of one count of felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant alleges evidentiary error, claiming that the trial court improperly (1) admitted testimony that he was a member of a gang and that a state's witness had to be relocated as a result of inculpating the defendant, and (2) refused to admit into evidence letters written by a state's witness to the defendant while the defendant was incarcerated, prevented the defendant from questioning the state's witness about the termination of her employment, and prevented the defendant from questioning the state's witness about her birth control practices. Additionally, the defendant claims that the prosecutor improperly referred to facts not in evidence during closing argument to the jury. We affirm the judgment of the trial court.[1]

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. In the early hours of April 11, 1998, Wilfred Morales, the owner of Morales Café, was closing his bar for the night. As part of his routine, Morales counted the cash and checks he received from the patrons and placed the proceeds in a blue bank bag. At approximately 2:30 a.m. that morning, Morales was shot and killed on a street near his home in Waterbury.

Twelve years later, Damaris Algarin-Santiago,[2] the estranged wife of the defendant's brother, Victor Santiago, provided a written statement to the police. In that statement, Algarin implicated the defendant, Santiago, and another brother of the defendant, Thomas Bonilla, in Morales' death. The defendant ultimately was charged with the murder of Morales.

Algarin was the state's chief witness in its prosecution of the defendant. Algarin testified that she had been in a relationship with Santiago since 1993 and that they eventually married in 2004.[3] Throughout their time together, Santiago abused Algarin on a regular basis, both physically and emotionally. The couple had two children at the time of Morales' murder.

In her testimony at trial, Algarin recounted the events of April 11, 1998. At approximately 3 a.m., Algarin was awakened by Santiago, who was screaming at her to come downstairs. Upon doing so, Algarin saw a coffee table full of money, checks,[4] and a blue leather bag with a zipper. She also saw Bonilla counting the checks and cash as the defendant dismantled a pistol in the kitchen and Santiago cleaned the pistol parts with baby oil to remove fingerprints. When Algarin asked what had happened, Santiago immediately started to beat her. The three brothers continued to argue about what had transpired and were upset about the number of checks

relative to the amount of cash. Algarin again asked what had happened, and the defendant responded that they had shot Morales.

Algarin testified that the defendant and his two brothers were in need of money and thus sought to rob Morales that night, believing that the Good Friday holiday would result in a large amount of cash. To become familiar with Morales' routine, Algarin testified that Santiago stalked Morales for some time. Thereafter, Santiago planned to act as the driver while Bonilla and the defendant would lie in wait in the bushes to commit the robbery. When Bonilla and the defendant confronted Morales on the night in question, the defendant shot him to death. The defendant gave Algarin two explanations for doing so: (1) he believed Morales was reaching for a gun, and (2) he wanted revenge due to his belief that Morales had shot Santiago some years earlier.[5]

Upon arriving at Algarin's home after the shooting, the defendant and his brothers burned the checks in the kitchen sink,[6] cleaned the weapons of fingerprints, and placed the dismantled pistol parts into three separate bags. To further conceal their crime, the three brothers burned their clothing in a barrel behind the house and cleaned the car to remove gun residue. When Santiago returned, he again started to beat Algarin after her repeated inquiries into what had transpired and threatened to kill her mother. When she refused to go with him to dispose of the bags filled with the gun parts, Santiago continued to beat Algarin until the defendant intervened. Reluctantly, she agreed and accompanied Santiago to dispose of the bags. When the third bag was thrown into the Naugatuck River, Santiago again threatened to kill Algarin, her mother, and their children, stating that "[n]ow you know what we're capable of."

Subsequently, the defendant and his brothers concocted an alibi that they and Algarin had been celebrating Bonilla's return from prison by eating fish for Good Friday at the home of Santiago's mother. Later that day, Santiago and Bonilla accompanied Algarin to deposit the cash into her bank account via an automated teller machine (ATM). Algarin testified that she deposited three separate envelopes of cash, which she believed to have totaled $3000. When the cash was cleared by the bank on the following Monday, Santiago and Bonilla went with Algarin to make a withdrawal, at which time Algarin gave the cash to Santiago.

From 1998 to 2010, Algarin was questioned by the police on approximately seven occasions. Each time, she stuck to the manufactured alibi out of fear for her safety and the safety of her family. Knowing that the defendant, Santiago, and Bonilla were affiliated with nationwide gangs,[7] Algarin was particularly afraid of reprisals should she provide the police with any information. During this period, however, she did divulge

some information to three people. Approximately one year after Morales' murder, Algarin revealed to Ralph C. Crozier, an attorney whom she knew, that the defendant and his two brothers had been involved in the homicide.[8] She also provided details of the homicide to Sally Roden-Timko, a coworker at Waterbury Hospital, who would confirm the interaction in a statement given to the police in 2010. Algarin later discussed details about the homicide with Luis Maldonado, a person she began dating in 2009 while Santiago was incarcerated for an unrelated matter.

Despite being incarcerated throughout much of the twelve year interval, Santiago continued to threaten Algarin. After a newspaper article was published on the investigation into Morales' murder, the defendant, who was also incarcerated on an unrelated criminal matter during the twelve year interval, instructed Algarin to write to the defendant three letters that were intimate and particularly salacious in nature. The defendant had requested the letters for the purpose of discrediting Algarin in the event that she were ever to testify against him.[9]

In 2010, Maldonado was arrested in connection with an unrelated crime. Following his arrest, Maldonado provided the police with details about Morales' murder and further indicated that Algarin could provide more information. Algarin subsequently was visited by a detective from the Waterbury Police Department and taken to the police department. Fearing that Maldonado had disclosed information and concerned that he would be murdered by Santiago if he were incarcerated, Algarin abandoned the alibi and provided a seven page statement to the police detailing the events of Morales' murder.

On February 16, 2017, the defendant was charged by substitute information with one count of murder in violation of General Statutes § 53a-54a and one count of felony murder in violation of § 53a-54c. Following a jury trial, the defendant was found guilty of felony murder. When the jury became deadlocked on the charge of murder, the court declared a mistrial on that charge.[10] The court thereafter sentenced the defendant to a total effective term of sixty years of incarceration. This appeal followed.

I

On appeal, the defendant first raises two claims of error with respect to the admission of certain evidence. The defendant alleges that the court improperly admitted evidence (1) of his and Santiago's gang affiliations and (2) that Algarin was relocated by the state. According to the defendant, these allegedly improper rulings constituted harmful error. We disagree.

Before addressing each of the challenged evidentiary rulings, we first set forth the applicable standard of

review. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Santiago*, 187 Conn. App. 350, 357, 202 A.3d 405, cert. denied, 331 Conn. 902, 201 A.3d 403 (2019).

A

We first address the defendant's claim that the trial court improperly admitted evidence that both he and Santiago were gang members. According to the defendant, because the crime charged was not criminal activity pursuant to gang membership, this evidence was both irrelevant and highly inflammatory.[11] In response, the state argues that those gang affiliations were highly probative in explaining why Algarin waited twelve years to provide a statement to the police. We agree with the state.

The following additional facts are relevant to this claim. Prior to his trial, the defendant filed a motion in limine in response to the state's notice of its intent to introduce evidence of the gang affiliations. Specifically, the state sought to introduce testimony from Algarin that the defendant and Santiago were members of the Latin Kings gang. The purpose of this testimony, the state argued, was to illustrate the extent to which Algarin feared retaliation from Santiago, the defendant, or other gang members. According to the state, Algarin's fear of the defendant and his brothers bore directly on her reason for waiting twelve years to provide the police with inculpating evidence.

After balancing the probative value of the evidence against the danger of unfair prejudice, the court allowed the testimony for the limited purpose proposed by the state. As the court explained, "to the extent that the state is going to introduce evidence that . . . [Algarin] was afraid to disclose this [evidence] because . . . the defendant and/or Victor Santiago was a member of the Latin Kings street gang; that they are a group of people that have access to people in many places; and that they have access to weapons, I would allow it just for that purpose. I would not allow the introduction of that evidence to go to whether [the defendant] did this crime, and so I would do a limiting instruction regarding the introduction of that evidence if that comes in as an explanation for her delay in disclosing this."

During the state's direct examination of Algarin, the defendant again objected to the introduction of testimony concerning the gang affiliations. Outside the presence of the jury, the court reiterated that it would allow the testimony to establish Algarin's fear of reprisals but cautioned that it would give a limiting instruction that

gang membership was not to be used for any other purpose. Algarin then testified that the delay was a result of her fear that she, her family, and Maldonado would be retaliated against by members of the gangs with which the defendant and Santiago were affiliated. Immediately after this testimony, the court provided a limiting instruction and cautioned the jury that any evidence of gang affiliations was admitted only "to show why the witness delayed or why the witness disclosed at a certain time."

The relevant legal principles governing our review of this claim are well settled. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tend[s] to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429, 64 A.3d 91 (2013); see also Conn. Code Evid. § 4-1 ("[r]elevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence" (internal quotation marks omitted)). "To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend[s] to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilson*, supra, 429. "The trial court has wide discretion to determine the relevancy of evidence . . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's [rulings on these bases]." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 181, 193 A.3d 1 (2018), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

Even if evidence is deemed relevant, § 4-3 of the Connecticut Code of Evidence provides that such evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence." "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the [jurors]." (Internal quotation marks omitted.) *State* v. *Wilson*, supra, 308 Conn. 429–30. Therefore, "[t]o be unfairly prejudicial, evidence must be likely to cause a disproportionate emotional response in the jury, thereby threatening to overwhelm its neutrality and rationality to the detriment of the opposing party. . . . A mere adverse effect on

the party opposing admission of the evidence is insufficient. . . . Evidence is prejudicial when it tends to have some adverse effect [on] a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 575–76, 46 A.3d 126 (2012). Additionally, evidence may be considered cumulative "if it multiplies witnesses or documentary matter to any one or more facts that were the subject of previous proof. . . . The court's power in that area is discretionary. . . . In precluding evidence solely because it is cumulative, however, the court should exercise care to avoid precluding evidence merely because of an overlap with the evidence previously admitted." (Internal quotation marks omitted.) *State* v. *Porfil*, 191 Conn. App. 494, 531, 215 A.3d 161, cert. granted on other grounds, 333 Conn. 923, 218 A.3d 67 (2019).

We first address the issue of relevancy. Both the defendant and the state agree that the reason for Algarin's twelve year delay in providing information to the police—and, therefore, Algarin's credibility—was a central issue at trial. To explain the delay, Algarin testified that she deeply feared that providing information to the police would result in gang reprisals. She further testified that she not only was afraid for her own safety but also was concerned that her children, Maldonado, and other family members would be subjected to retaliation.

This court has previously held that evidence of gang membership is relevant "to aid the trier to determine" why a person delayed before reporting a crime. *State* v. *Cruz*, 56 Conn. App. 763, 771–72, 746 A.2d 196 (2000), aff'd, 260 Conn. 1, 792 A.2d 823 (2002). In that case, this court noted that the victim's more than two year delay in reporting the defendant's sexual assault of her was "an issue directly involving [her] credibility." Id., 771. The victim's belief that the defendant was a gang member "was probative of that issue raised." Id., 772. There similarly is little doubt that the evidence at issue here was relevant to explain Algarin's state of mind when she delayed for twelve years before providing the police with information about Morales' murder.[12]

Having concluded that the evidence was relevant, we next turn to the defendant's argument that the trial court abused its discretion by failing to properly balance the probative value of the evidence with the danger of unfair prejudice. Moreover, the defendant claims that the evidence was merely cumulative with respect to Algarin's fear of the defendant and his brothers. Upon a careful review of the record, we are satisfied with the court's cautious approach in balancing the probative value of Algarin's testimony with its prejudicial effect.

In hearing argument on the defendant's motion in limine, the court explicitly noted its need to carefully balance the probative value of the evidence to "make

sure that it does not result in unfair prejudice . . . ." To quell the potential for unfair prejudice in light of the highly probative value of the evidence, the court expressed its intent to limit both the scope of Algarin's testimony and the purpose for which evidence of gang affiliation was to be admitted.[13] Immediately following Algarin's testimony on the topic, the court instructed the jury that the only purpose of this evidence was "to show why [Algarin] was afraid to disclose or why [Algarin] disclosed at the time that she did. And it's not admitted for any other purpose." In its jury charge, the court again cautioned the jury about the use of this evidence, instructing the jury that the evidence was not "admitted to prove the bad character, propensity, or criminal tendencies of the defendant, [Santiago], or [Bonilla]. . . . You may consider such evidence if you believe it and further find that it logically . . . supports the issue for which it is being offered by the state, but only as it may bear on the issue of fear of [Santiago], the defendant, and [Bonilla] on the part of [Algarin] . . . ." The court further explained that to use the evidence for any other purpose would "predispose your mind uncritically to believe that the defendant and the others may be guilty of the offenses here charged merely because of the alleged . . . gang membership."

Additionally, we disagree with the defendant that the evidence was merely cumulative in establishing Algarin's fear of the defendant and his brothers. First, Santiago's threats and history of physical abuse was a distinct and separate basis for her fear. It did little to establish the extent to which she feared Santiago, namely, why she would fear him despite his having been incarcerated. Second, evidence of the defendant's gang affiliation was pertinent to establish that, in addition to Santiago, Algarin's fear extended to both the defendant and Bonilla.[14] Third, this evidence illustrates the extent to which Algarin feared retaliation by other gang members against herself and family members. For those reasons, the court acted well within its "wide and liberal discretion" to determine that the evidence was not "repetitious, remote or irrelevant." (Internal quotation marks omitted.) *State* v. *Gutierrez*, 132 Conn. App. 233, 237, 31 A.3d 412 (2011).

In sum, the evidence that the defendant and Santiago were affiliated with nationwide gangs was highly probative to explain why Algarin delayed twelve years before coming forward to the police. The court was cognizant of the potential for this evidence to inflame the jurors' emotions and thus carefully balanced its probative value against the potential for unfair prejudice. Because of the inherently prejudicial nature of this testimony, we note that the court's "[l]imiting instructions serve[d] to minimize the prejudicial impact" of the evidence of gang affiliations. (Internal quotation marks omitted.) *State* v. *Brown*, 199 Conn. 47, 58, 505 A.2d 1225 (1986). We therefore conclude that the trial court did not abuse

its discretion by admitting Algarin's testimony regarding the gang affiliations of the defendant and Santiago.

B

The defendant next claims that the court improperly admitted evidence that Algarin was relocated by the state immediately after providing her statement to the police. In particular, the defendant argues that this testimony unfairly bolstered her credibility, was unduly prejudicial, and suggested that he was a violent person. In response, the state argues that the evidence was properly admitted to show the hardship that Algarin endured and her fear of retaliation as a result of coming forward to testify.[15] The state further argues that, even if the evidence was improperly admitted, the error was harmless. We conclude that the court did not abuse its discretion under the particular circumstances of this case.

The following additional facts are relevant to this claim. At trial, the prosecutor asked Algarin whether she continued to live in Waterbury after giving her statement to the police. The defendant immediately objected, believing that the prosecutor was about to elicit evidence about the witness protection program. See footnote 18 of this opinion. Outside the presence of the jury, the defendant argued that any testimony regarding Algarin's placement in the witness protection program would be unduly prejudicial. The defendant further asserted that this testimony "emphasizes the fact that the government agency, whether it's a state or federal, believes [Algarin] is in danger and [has] paid for her care since the time of this so-called disclosure." In response, the state argued that evidence of Algarin's relocation was probative of her fear of retaliation. The court agreed that Algarin should not refer to the "witness protection program" but ruled that the state could elicit details on how her life has been impacted since the disclosure, including how she was relocated at the state's expense. The court thereafter instructed Algarin not to use the phrase, "witness protection program."[16] Algarin subsequently testified that she, her children, and Maldonado were relocated out of the state and had continued to be relocated numerous times. The state referenced this fact in its closing argument, noting that Algarin was "immediately relocated with her four children" after giving her statement to the police, and that she was "still in relocation, still in fear of the three individuals."

We now set forth the relevant legal principles governing this claim. "In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Internal quotation marks omitted.) *State* v. *Alex B.*, 150 Conn. App. 584, 593, 90 A.3d 1078, cert. denied, 312 Conn. 924, 94 A.3d 1202 (2014). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden

of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Grant*, 179 Conn. App. 81, 90, 178 A.3d 437, cert. denied, 328 Conn. 910, 178 A.3d 1041 (2018). "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *LeBlanc*, 148 Conn. App. 503, 509, 84 A.3d 1242, cert. denied, 311 Conn. 945, 90 A.3d 975 (2014). "Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Miguel C.*, supra, 305 Conn. 578–79.

We first note that evidence of Algarin's relocation was highly probative and relevant with respect to a central issue in the case: Algarin's delay in reporting her knowledge about the murder to the police due to her fear of retaliation by the defendant and Santiago. See *State* v. *Cruz*, supra, 56 Conn. App. 771–72. The jury reasonably could conclude that Algarin's willingness to subject herself to the upheaval and disruption of moving herself and her four children multiple times was credible evidence of her belief that, due to the defendant's gang affiliation, she and her family were not safe. Whether such evidence should have been excluded because it was unduly prejudicial is a matter of first impression in this state. "In the absence of authoritative Connecticut case law . . . we turn for guidance to federal law." *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 88, 931 A.2d 237 (2007); see also *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 736, 610 A.2d 1238 (1992) (looking to federal Circuit Courts of Appeals for guidance on matter of first impression).

A number of federal Circuit Courts of Appeals that have addressed the issue have cautioned that admitting evidence of a testifying witness' placement in a witness protection program "must be handled delicately." *United States* v. *Partin*, 552 F.2d 621, 645 (5th Cir.), cert. denied, 434 U.S. 903, 98 S. Ct. 298, 54 L. Ed. 2d 189 (1977); see also *United States* v. *Melia*, 691 F.2d 672, 675 (4th Cir. 1982) (evidence of witness' participation in witness protection program should be admitted "with great caution"). "Although disclosure of such participation must be handled delicately . . . so as to minimize the possibility that the jury will infer that the defendant was the source of danger to the witness, such testimony is permissible so long as the prosecutor does not attempt to exploit it." (Citation omitted; internal quotation marks omitted.) *United States* v. *DiFrancesco*, 604

F.2d 769, 775 (2d Cir. 1979), rev'd on other grounds, 449 U.S. 117, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980); see also *United States* v. *Ciampaglia*, 628 F.2d 632, 640 (1st Cir.) (risk of undue prejudice to defendant by government's reference to witness' participation in "witness protection program" generally minimal when not exploited by prosecution), cert. denied, 449 U.S. 956, 101 S. Ct. 365, 66 L. Ed. 2d 221 (1980), and cert. denied sub nom. *Bancroft* v. *United States*, 449 U.S. 1038, 101 S. Ct. 618, 66 L. Ed. 2d 501 (1980). This is especially so when testimony implies that the witness' participation in the witness protection program was predicated on threats made by the defendant. See *United States* v. *Frankenberry*, 696 F.2d 239, 242 (3d Cir. 1982) (evidence of witness' participation in witness protection program proper when prosecution "does not exploit any inference of threat from the defendant"), cert. denied, 463 U.S. 1210, 103 S. Ct. 3544, 77 L. Ed. 2d 1392 (1983); cf. *United States* v. *Vastola*, 899 F.2d 211, 235–36 (3d Cir.) (only slight potential for prejudice when testimony "only vaguely suggests" that witness was placed in witness protection program due to threats by defendant), vacated and remanded, 497 U.S. 1001, 110 S. Ct. 3233, 111 L. Ed. 2d 744 (1990). However, such evidence may be introduced "to counter any inference of improper motivation or bias and, under some circumstances, may [be presented] on direct examination in anticipation of a defense attack upon the witnesses' credibility." *United States* v. *Melia*, supra, 675; see *United States* v. *Ciampaglia*, supra, 639–40 (no reversible error when evidence of witness' participation in witness protection program brought out on direct examination). As the United States Court of Appeals for the Fourth Circuit has observed, "[t]here can be no simple formula with which to calculate how much evidence concerning the [w]itness [p]rotection [p]rogram is appropriate and permissible in a given case to counter defense attempts to discredit [g]overnment witnesses. . . . The trial court must exercise its discretion, bearing in mind the purpose of the evidence—to rebut, in appropriate circumstances, the appearance of special treatment and improper motivation or bias." *United States* v. *Melia*, supra, 676. Notably, the previously discussed authority does not hold that references to a witness protection program are per se unduly prejudicial.

We believe *Melia* sets forth a persuasive approach to balancing these considerations. In that case, the Fourth Circuit was presented with the question of whether extensive testimony detailing two key government witnesses' participation in the federal witness protection program entitled the defendant to a new trial. Id., 674–75. During the defendant's trial on a charge of receiving stolen goods, the government presented overwhelming evidence concerning one of its key witness' participation in the witness protection program, including testimony from a number of federal agents involved with

the program. Id., 675–76. The court thus concluded that the "dramatic" testimony regarding the witness protection program "was excessive—an abuse by the government of its privilege to utilize this potentially volatile evidence." Id., 676. Because the result of the trial hinged essentially on credibility, the court reasoned that "[i]t [was] quite possible that the jury considered this impressive testimony as positive evidence of [the defendant's] bad character and guilt" while also bolstering the credibility of the government witnesses. Id.

In the present case, in weighing the probative value of the relocation testimony against its prejudicial impact on the defendant, we are mindful of the principle that relevant evidence adverse to a party is always prejudicial. E.g., *State* v. *Wilson*, supra, 308 Conn. 429; see also *Chouinard* v. *Marjani*, 21 Conn. App. 572, 576, 575 A.2d 238 (1990) ("[a]ll evidence adverse to a party is, to some degree, prejudicial"). We, therefore, consider whether the evidence was *unfairly* prejudicial to the defendant. We are further guided by the principle that "the imprimatur of the [state] . . . may induce the jury to trust the [state's] judgment rather than its own view of the evidence." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015).

Here, the court restricted the state from explicitly referencing the witness protection program, although it allowed the state to question Algarin about her relocation at "state expense . . . ." As we noted previously, Algarin testified that she, her four children, and Maldonado "were relocated," without referencing either the witness protection program or the phrase, "at state expense . . . ." In its summation to the jury, the state argued that Algarin was "immediately relocated with her four children" after she gave her statement to the police and that she was "still in relocation, still in fear of the three individuals." The prejudice to the defendant was evoked by the use of the passive voice—"was relocated," which alluded to a third party, presumably the state, as having facilitated Algarin's relocation. See footnote 15 of this opinion. The state could have elicited relevant testimony about her fear of retaliation without implicating the state's involvement by asking her why she was no longer living in Waterbury and how many times she had moved. The offending phrase, "was relocated," which we conclude was prejudicial, does not, however, have the same unduly prejudicial impact as "witness protection program" or at "state expense."

The case of *United States* v. *Deitz*, 577 F.3d 672, 689 (6th Cir. 2009), cert. denied, 559 U.S. 984, 130 S. Ct. 1720, 176 L. Ed. 2d 201 (2010), is analogous to the circumstances of the present case. In *Deitz*, the United States Court of Appeals for the Sixth Circuit addressed the question of whether evidence of various witnesses' participation in the witness protection program was

prejudicial and had no relevance to a charge against the defendant of conspiracy to possess and to distribute drugs or to his involvement in a gang related shooting. Id., 688–90. The court rejected that argument, holding that the evidence "was relevant to the [gang's] history of violence and reputed practice of retaliating against witnesses and informants." Id., 689. In doing so, it stressed its "disapproval of such references by a prosecutor when the need for protection is not obvious, relevant, nor made an issue by defense counsel . . . ." (Internal quotation marks omitted.) Id. That the prosecutor neither used evidence of the witness protection program to enhance the witnesses' credibility nor implied that the defendant was the source of threats to the witnesses assuaged any risk of undue prejudice. Id.

Given this guidance, we are persuaded that the probative value of the relocation testimony was not outweighed by the prejudicial impact to the defendant.[17] The court, therefore, did not abuse its discretion in permitting the testimony. We emphasize that this is so despite the court's invitation to the prosecutor to reference that Algarin was relocated "at state expense . . . ." As the record indicates, the court believed that the state was entitled to bring out how Algarin's life was drastically affected as a prophylactic measure in anticipation that Algarin would be cross-examined on her claim that she feared retaliation.[18] To the extent that the court believed that such evidence would in fact be the subject of cross-examination, its emphasis on allowing reference to "state expense" because it "cuts both ways," has merit. See *United States* v. *Adamo*, 742 F.2d 927, 944 (6th Cir. 1984) (evidence that witness is participant in witness protection program and therefore paid and protected by government "simultaneously enhances and undermines a witness' credibility"), cert. denied sub nom. *Freeman* v. *United States*, 469 U.S. 1193, 105 S. Ct. 971, 83 L. Ed. 2d 975 (1985). Therefore, the better practice would have been for the court to instruct the state not to implicate its involvement in relocation efforts in any way on direct examination by use of the passive voice or the phrase, "at state expense . . . ." Unless and until further explication in rebuttal is triggered by the defense in cross-examination, we emphasize that the reference to state support is unnecessarily prejudicial to the defendant. Notwithstanding these concerns, and given both the passive and infrequent references to the witness protection program, as well as the absence of the prosecutor's exploitation of that evidence, we conclude that the court did not abuse its discretion in allowing testimony that Algarin had been relocated.[19]

## II

The defendant next claims that the court improperly (1) refused to admit three sexually explicit letters Algarin wrote to him, (2) precluded questions during cross-

examination of Algarin regarding the termination of her employment at Waterbury Hospital, and (3) restricted inquiry into her birth control practices. The defendant argues that, as a result of these adverse evidentiary rulings, the court deprived him of his rights to present a defense and to confrontation. In response, the state asserts that the court properly exercised its discretion in deciding all of the challenged evidentiary rulings. The state further disagrees that these rulings implicated the defendant's constitutional rights. The state asserts that, assuming any errors occurred with respect to the court's evidentiary rulings, such errors are neither constitutional in nature nor harmful. We agree with the state that the defendant's claims of error are not constitutional in nature and further conclude that any errors were harmless.[20]

We begin by setting forth the relevant legal principles governing our review. "Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 379, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

It is well established that "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . .

"However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion

to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Leconte*, 320 Conn. 500, 510–11, 131 A.3d 1132 (2016).

"Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985). Both this court and our Supreme Court have stated that, when a defendant is afforded wide latitude in cross-examining a state's witness as to credibility, claims of sixth amendment violations for restrictions on cross-examination are indicia of "the defendant [putting] a constitutional tag on a nonconstitutional claim." Id.; see also *State* v. *Jordan*, 329 Conn. 272, 287–88 n.14, 186 A.3d 1 (2018) (claim of improper exclusion of evidence of victim's convictions not constitutional in nature when jury heard testimony that, if credited, would support theory of self-defense); *State* v. *Durdek*, 184 Conn. App. 492, 511 n.10, 195 A.3d 388 (noting that "multiple avenues of impeachment" defendant was afforded in cross-examining "important state witness" supported conclusion that claimed errors were evidentiary, not constitutional, and defendant therefore had burden of establishing harm), cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018); cf. *State* v. *Peeler*, supra, 271 Conn. 383–85 (trial court's failure to admit mental health records of state's witness precluded relevant line of inquiry into witness' ability to perceive events and was therefore of constitutional magnitude). The effect of this determination necessarily dictates the burden of proof, for if the court determines that the claimed error is constitutional in nature, the state has the burden of demonstrating harmlessness beyond a reasonable doubt, whereas a converse determination leaves the defendant with the burden to both prove an abuse of discretion and to demonstrate harm. See, e.g., *State* v. *Peeler*, supra, 384.

### A

For purposes of clarity in assessing each of the three claimed errors, we believe it prudent in the first instance to assess whether these claims are constitutional in nature. Upon a careful review of the record, we conclude that they are not. The record plainly reveals that the defendant was given ample opportunity to "expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *State* v. *Leconte*, supra, 320 Conn. 512. Indeed, the defendant made numerous attempts to impeach Algarin's credibility with respect to inconsistent testimony she had provided in other proceedings related to the murder of Morales.[21]

Moreover, the court allowed the defendant to rigor-

ously cross-examine Algarin with respect to relevant lines of inquiry, most importantly, her fear of the defendant and his brothers. Algarin was extensively questioned on this issue by the defendant, including two of the areas of inquiry complained of.[22] For instance, the defendant questioned Algarin about the intimate nature of the letters she sent to the defendant, the endearing letters she wrote to Santiago while he was incarcerated, about her having routinely sent Santiago money while he was incarcerated on an unrelated matter, and about her having continued to have children with Santiago. The defendant also sought to undermine her credibility through other means, particularly through his introduction of testimony from a bail bondsman whom Algarin had frequented as late as 2007 in her efforts to have Santiago released on bond in connection with charges that were unrelated to Morales' murder. In addition, defense counsel elicited testimony from Roden-Timko, who, when asked if she had an impression of Algarin's truthfulness and honesty, responded that Algarin was "unreliable, if I had to sum it up in one word." The defendant also offered testimony from Norman A. Pattis, an attorney who had represented Santiago in another criminal matter. Pattis described Algarin and Santiago's relationship as loving and testified that he had no concerns as to whether she was fearful of Santiago.[23]

As the record demonstrates, the defendant was afforded "multiple avenues of impeachment" in his cross-examination of the state's key witness. *State* v. *Durdek*, supra, 184 Conn. App. 511 n.10; see also *State* v. *Vitale*, supra, 197 Conn. 402–403 (noting that wide latitude of cross-examination by defendant was suggestive that claimed evidentiary errors were nonconstitutional in nature). The defendant took full advantage of this latitude and attempted to undermine Algarin's explanation that her fear of the defendant and Santiago was the reason for her twelve year delay in providing information to the police about Morales' murder. We therefore conclude that the defendant's claims are nonconstitutional and are subject to the standard of review governing claims of evidentiary impropriety.

B

Having determined that the defendant's claims are evidentiary in nature, we set forth the applicable standard of review as to each claimed evidentiary impropriety. "[I]n order to establish reversible error . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003).

1

The defendant first claims that the court improperly failed to admit three letters Algarin wrote to the defendant. We agree, but, nevertheless, conclude the error

to be harmless.

The following additional facts are relevant to our resolution of this claim. Prior to trial, the state filed a motion in limine to preclude the defendant from introducing letters Algarin wrote to the defendant.[24] The court initially found the letters to be irrelevant and therefore inadmissible, but underscored that they may become relevant to counter Algarin's assertion that she was afraid of the defendant. During trial, the defendant notified the court that he still intended to go into the issue of Algarin's having sent letters to him while he was incarcerated and also expressed his intent to introduce the letters into evidence. The defendant argued that the letters served two purposes. First, the letters undercut Algarin's contention that the reason for her twelve year delay in providing information to the police was that she feared the defendant. Second, the letters went to the defense theory that Algarin was motivated by ill will toward the defendant for having informed Santiago about the letters, which allegedly resulted in the breakdown of Algarin and Santiago's relationship. The court decided against admitting the letters in their entirety, finding that their probative value was far outweighed by unfair prejudice.[25] The court, however, did rule that the defendant could question Algarin about the nature of the letters but could not recite language that was salacious in nature.[26]

During her testimony, Algarin admitted that she had sent three sexually explicit letters to the defendant while he was incarcerated. She explained that the defendant had called and requested the letters as an "insurance policy" against her in the event she were ever to testify against him. After agreeing to write the letters, Algarin went to "one of those raunchy [Internet] sites, and I wrote everything . . . I saw." After Algarin's testimony regarding the letters, the defendant again sought to admit the letters into evidence, and the court again sustained the state's objection to their introduction.[27]

We begin our legal analysis by reiterating that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. "In determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: (1) . . . the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Winfrey*, 302 Conn. 195, 215–16, 24 A.3d 1218 (2011). "[T]he test for determining whether evidence is unduly

prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003).

On hearing argument regarding the admissibility of the letters, the court merely held that "[their] probative value is outweighed by unfair prejudice." The court again reiterated its determination that due to their salacious content, "the unfair prejudice outweighs [their] probative value . . . ." The state has taken the position that the court acted within its discretion "in finding that the profane language used in the letters posed a risk of undue prejudice . . . ." We disagree.

We acknowledge that evidence that is intimate or embarrassing may, in certain circumstances, "give rise to a real risk of unfair prejudice . . . ." *State* v. *Sandoval*, supra, 263 Conn. 545; see id. (trial court improperly determined that probative value of evidence of sexual assault victim's abortion was outweighed by danger of unfair prejudice). We conclude, however, that such circumstances did not exist in the present matter. The state's argument that the profane language was enough to warrant exclusion is unavailing. Contrary to this assertion, it is precisely the fact that the content of the letters was sexually graphic and intimate, and thus bore directly on Algarin's purported reason for authoring the letters. Whether that explanation was credible was a matter for the jury to decide. See, e.g., *State* v. *Davis*, 283 Conn. 280, 331, 929 A.2d 278 (2007). We therefore conclude that the court improperly refused to admit the letters into evidence.[28]

Having resolved the first inquiry, we now turn to whether the defendant has satisfied his burden to establish that the court's error was harmful. We conclude that he has not.

As discussed in part I B of this opinion, the principles of law governing our review of harmlessness with respect to nonconstitutional evidentiary claims is well settled. See *State* v. *Calabrese*, 279 Conn. 393, 411–12, 902 A.2d 1044 (2006) ("an appellate court may conclude that a nonconstitutional error is harmless only when it has a fair assurance that the error did not substantially affect the verdict" (internal quotation marks omitted)); see also *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019) (applying same factors for harmless error analysis to adjudicate claim that evidence was improperly excluded).

First, although defense counsel could not recite verbatim the sexually explicit language in the letters, he took full advantage of the court's permission to provide the gist of their graphic content. Moreover, defense counsel was fully entitled to recite the affectionate language contained therein. The following exchanges dur-

ing Algarin's cross-examination underline the extent to which the jury was exposed to the nature of the letters and defense counsel's efforts to cross-examine Algarin on the veracity of her explanation for authoring them:

"[Defense Counsel]: Okay. Do you remember sending [the defendant] a letter in the jail?

"[Algarin]: Yes.

"[Defense Counsel]: Do you remember sending him a series, three letters that were sexually explicit?

"[Algarin]: Yes.

"[Defense Counsel]: This is your husband's brother, correct?

"[Algarin]: Yes. . . .

"[Defense Counsel]: Do you remember saying I love you?

"[Algarin]: It says it there.

"[Defense Counsel]: Is that your handwriting?

"[Algarin]: Yeah.

\* \* \*

"[Defense Counsel]: You did say that you did send sexually explicit letters to [the defendant], correct?

"[Algarin]: Yes, sir.

"[Defense Counsel]: And you sent at least three, correct?

"[Algarin]: I believe so.

"[Defense Counsel]: Now, after you sent those letters to [the defendant], isn't it true that [Santiago], after being with you for sixteen years, broke up with you in 2009?

"[Algarin]: That is not true.

\* \* \*

"[Defense Counsel]: Now, you said something about the letter that you wrote to [the defendant], that you went to a website?

"[Algarin]: AOL.

"[Defense Counsel]: To look up what?

"[Algarin]: I went to an adult website, and I wrote down what I saw.

"[Defense Counsel]: What you saw on the adult website?

"[Algarin]: Yes, sir. . . .

"[Algarin]: [The defendant] asked me to write B-Real.

"[Defense Counsel]: Did he ask you in a letter? Did he send you a letter saying correspond with me with sexually explicit language and use the—

"[Algarin]: He asked me—he needed something for reassurance that I was not gonna snitch.

"[Defense Counsel]: That's a letter that he wrote to you?

"[Algarin]: No. That's a conversation we had.

"[Defense Counsel]: When did you have that conversation?

"[Algarin]: After [Bonilla] moved in and that article came out in the newspaper . . . .

"[Defense Counsel]: And had you used AOL to get the verbiage out of—for that letter as well?

"[Algarin]: Some of it, yeah.

"[Defense Counsel]: Some of it?

"[Algarin]: Yeah, 'cause it's not all sexual and not—not all saying, you know. Some of it's saying, hey, how are you, and some of it's very sexual.

"[Defense Counsel]: Very sexual, correct?

"[Algarin]: Yeah.

"[Defense Counsel]: Okay. And you say that that was requested at the behest of my client?

"[Algarin]: Yes, 'cause this showed up in [Santiago's] trial as insurance."

Not only did defense counsel elicit testimony from Algarin in an attempt to undermine her supposed fear of the defendant and Santiago, but he continued to question Algarin about how her relationship with Santiago ended.[29] This phase of defense counsel's cross-examination was an unquestionable attempt to establish the defense theory that Algarin was motivated to come forward in an effort to retaliate against the defendant and Santiago for the ending of her relationship with Santiago.

Importantly, the wide latitude afforded to defense counsel in his cross-examination of Algarin—spanning nearly one and one-half days—provided the jury with other evidence that would have supported his theory that Algarin was, indeed, not afraid of the defendant or Santiago.[30] In fact, Algarin's two days of testimony provided evidence that she (1) continued to send Santiago money while he was incarcerated and during the twelve year interval, (2) married Santiago in 2004, (3) remained with him for ten years after Morales' murder, (4) received a reward for coming forward, (5) wrote warm and loving letters to Santiago during his incarceration, and (6) continued to have children with Santiago.

Given the extensive opportunity that defense counsel had to cross-examine Algarin, as well as his opportunity to quote the nonsalacious details of the letters and the extent of corroborating evidence to support Algarin's

testimony, we are not persuaded that the error substantially affected the verdict. See, e.g., *State* v. *Jordan*, supra, 329 Conn. 287–88.

2

The defendant next claims that the court improperly prevented him from examining Algarin about the termination of her employment at Waterbury Hospital. According to the defendant, this area of inquiry was important to further undermine Algarin's supposed fear of Santiago. We disagree and conclude that the court acted well within its discretion in precluding questions on this topic.

The following additional facts are relevant for the resolution of this claim. During cross-examination, defense counsel questioned Algarin about why her relationship with Santiago ended. Algarin explained that she ended the relationship after Santiago "faked a stroke" while he was in prison. See footnote 29 of this opinion. When Algarin was asked if she felt badly for Santiago in January, 2004, when he was admitted to the psychiatric unit at Waterbury Hospital, the court sustained the state's objection to that area of inquiry. The court found that the topic was a collateral issue that was too remote in time.[31]

"[I]t is well settled that [a] court . . . [may] exclude . . . evidence [that] has only slight relevance due to . . . its tendency to inject a collateral issue into the trial. . . . An issue is collateral if it is not relevant to a material issue in the case *apart from its tendency to contradict the witness*. . . . This is so even when the evidence involves untruthfulness and could be used to impeach a witness' credibility. . . . Whether a matter is collateral also is a determination that lies within the trial court's sound discretion. . . . Undoubtedly our case law permits a party to ask a witness about a collateral matter, with the limitation that the party must accept the witness' response without having the opportunity to impeach that witness with extrinsic evidence. . . . This does not mean, however, that the trial court is obligated to permit such questioning. In considering whether the court abused its discretion in this regard, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Annulli*, 309 Conn. 482, 493–95, 71 A.3d 530 (2013).

Upon a careful review of the record, we agree with the court that the reasons for the termination of Algarin's employment at Waterbury Hospital would have injected a collateral issue into the trial. Accordingly, we conclude that the court did not abuse its discretion in refusing to allow further inquiry.

3

The defendant's final claim of evidentiary error concerns the court's restriction on his ability to cross-examine Algarin about her birth control regimen. We conclude that this claim has no merit.

The following additional facts are relevant to this claim. During cross-examination of Algarin, defense counsel asked why she continued to have children with Santiago despite her fear of him. Algarin explained that Santiago would often hide her birth control, and she therefore had no choice but to continue having children with him. When defense counsel pressed Algarin about other manners in which she could have prevented having children with Santiago, the court sustained the state's objection to continued inquiry on the topic. The following day, the court again disallowed further inquiry into Algarin's birth control practices, finding the subject matter irrelevant.[32]

We conclude that the court did not abuse its discretion in preventing the defendant from further inquiring into this subject area. Although the court allowed some inquiry into the topic, it properly found that further questioning was irrelevant, as it would have inappropriately focused on a matter far too attenuated from the material issues in the case. See, e.g., *State* v. *Crespo*, 114 Conn. App. 346, 363, 969 A.2d 231 (2009), aff'd, 303 Conn. 589, 35 A.3d 243 (2012). Accordingly, we conclude that the court's ruling was proper.

### III

Last, we turn to the defendant's claim of prosecutorial impropriety. The defendant argues that the prosecutor made numerous statements during the state's rebuttal closing argument to the jury that referred to facts not in evidence. We disagree that any improprieties occurred.

We begin by setting forth the general principles under which we review claims of prosecutorial impropriety. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). "In analyzing whether the prosecutor's comments deprived the defendant of a fair trial, we generally determine, first, whether the [prosecutor] committed any impropriety and, second, whether the impropriety or improprieties deprived the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing argu-

ments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 537, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). With these principles in mind, we now examine each of the challenged remarks in this matter.

## A

The defendant's first claim of prosecutorial impropriety concerns a remark that indicated that Algarin had testified about Morales' murder consistently at previous proceedings. In his closing argument to the jury, defense counsel underlined instances when Algarin admitted to having testified inconsistently on a number of topics during prior proceedings.[33] Specifically, defense counsel noted that, during a 2010 proceeding, Algarin testified that she had counted the money before depositing it, thus contradicting her trial testimony that she had not. During rebuttal argument, the prosecutor stated that Algarin had testified on occasions prior to trial that she did not count the money before making the ATM deposits. After the jury was excused, the defendant argued to the court that there was no evidence that Algarin had testified that she did not count the money during proceedings subsequent to 2010. The court first noted that there was evidence before the jury that Algarin had testified in approximately five proceedings prior to trial.[34] In addressing the objection, the court concluded that a jury could properly draw an inference that if there were subsequent instances of Algarin's testimony being inconsistent other than in the 2010 proceeding, "we would have heard about it . . . ." On appeal, both parties submit that the court overruled the objection, and we thus analyze the claim accordingly. The state asserts that, contrary to the defendant's position, the evidence produced at trial provided a factual basis to argue that Algarin had consistently testified at previous proceedings that she did not count the money. We agree.

In assessing whether this statement was improper, we note that, "as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 428–29, 902 A.2d 636 (2006). A review of the record indicates that the remark at issue here was an attempt to have the jury draw an inference from the testimony elicited from Algarin during trial. In particular, the inference that Algarin had testified consistently in previous

proceedings on this particular issue was a response to the fact that defense counsel highlighted only a single inconsistency, which occurred during the 2010 proceeding. Importantly, one of the defendant's own exhibits—a transcript of Algarin's testimony during an August 18, 2016 proceeding—contains testimony in which she explicitly stated that it was not her, but Bonilla, who counted the cash. This evidence provided yet another factual basis for the argument that the defendant has challenged. For these reasons, the court ruled that the prosecutor's statement provided a sufficient basis for the inference that Algarin's testimony was not inconsistent in subsequent proceedings. We agree with the court's characterization and are therefore persuaded that the prosecutor's remark was based on "the reasonable inferences to be drawn" from the evidence adduced at trial. (Internal quotation marks omitted.) Id., 429.

B

The defendant next takes issue with the prosecutor's statement that "[the state's attorney's office] receive[s] no benefit from [Algarin]'s . . . testimony." The defendant claims that this statement was both unsubstantiated and untruthful. In response, the state asserts that it was obvious from the context of the prosecutor's argument that he clearly meant to refer to evidence that the state's attorney's office did not *provide* any *reward* to Algarin. According to the state, the prosecutor merely misspoke in reference to the reward money that had been offered for information about Morales' murder and disbursed by the governor's office in this case.

A fair reading of the record supports the state's contention. Importantly, the defendant excludes both the preceding and subsequent sentences of the remark with which he takes issue. The entire passage reads as follows: "You also heard that the police don't give her money. They're not in charge of the reward. The state's attorney's office isn't in charge of the reward, either. We receive no benefit from her test—testimony. That's decided by another entity." It is clear from the entire record that the prosecutor in this instance merely misspoke. Providing further context to this statement is the fact that Algarin, Crozier, and police Lieutenant Michael Slavin all testified that the reward was not disbursed by the police or the state's attorney's office. In fact, the latter two testified that the governor's office was the only entity that authorized the reward. From this testimony and the context of the statement at issue, it is clear that the remark was "merely an inadvertent misstatement. . . . Not every mistake by a prosecutor in closing argument, not every misstep, amounts to an impropriety." (Citations omitted.) *State* v. *Roberts*, 158 Conn. App. 144, 150–52, 118 A.3d 631 (2015).

C

The defendant claims that the following statement by the prosecutor was also improper: "What [Algarin] was consistent about was brought out by [another prosecutor in the case] that [Algarin]'s husband and [Bonilla] went to the bank with her. It had to be that Monday morning because she was always consistent about they were with her at the bank to take the money out." According to the defendant, there was no evidence that Algarin had testified consistently to this effect in previous proceedings. However, the state argues that this statement, although ambiguous, was not intended to refer to previous proceedings. According to the state, the intent of this statement was to indicate to the jury that Algarin was consistent during the *defendant's* trial about who was with her when she made the withdrawal.

We recognize that "closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial [impropriety], they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 441.

The record supports the state's argument that this statement, although ambiguous, was not intended to suggest that Algarin had testified consistently to this fact at previous proceedings. Rather, during the defendant's trial, Algarin testified that Santiago and Bonilla accompanied her to withdraw the cash, and she reiterated Santiago's presence on two other occasions during trial to pinpoint the exact date of the withdrawal. Because the prosecutor's argument is supported by the evidence, we decline to assume that it referenced Algarin's testimony from other proceedings.

D

The defendant also asserts that the following statement by the prosecutor was a reference to a fact not in evidence: that Algarin had "testified at a previous proceeding, and before you, [that] the reward had been out there for years." The state argues that the remark has been taken out of context. We agree.

The following provides the proper context to the statement of which the defendant complains: "[Algarin] testified at a previous proceeding, and before you, [that] the reward had been out there for years. She knew about it. When she was questioned by the police about that incident before she came clean that night in 2010, she knew the reward was out there and she still didn't say anything. And her reasoning—she told you why she didn't say anything. She testified because it wasn't

worth her life. The money wasn't worth her life. She stuck to the alibi story as she was told to do."

On review of the record, Algarin's testimony reflects that she knew of the reward as soon as it was offered and was aware of it when she continued to provide the police with the false alibi. As the state reasonably argues, this statement, placed in its context, was a "fair, though possibly inartful, summary of Algarin's testimony . . . ." The prosecutor's remark—that Algarin knew of the reward at the time of the prior proceedings—was clearly an invitation for the jury to draw a reasonable inference from the fact that she knew of the reward before any proceedings had taken place. See *State* v. *Stevenson*, 269 Conn. 563, 587–88, 849 A.2d 626 (2004) (prosecutor's remarks in closing argument that defendant cooperated with police to receive favorable plea deal was not mere speculation but was reasonable inference for jury to draw from evidence adduced at trial).

E

The defendant next takes issue with the prosecutor's remark that, when the defendant and Santiago were incarcerated, Bonilla moved in with Algarin uninvited "to keep an eye on her." The state contends that this is a reasonable inference that can be drawn from the evidence adduced at trial. A careful review of the record clearly supports the state's argument.

During the state's redirect examination, Algarin testified that while the defendant and Santiago were incarcerated, a newspaper article reported that the investigation into Morales' murder was being reopened. After the article's publication, Bonilla moved into Algarin's apartment uninvited. The fair—if not the only reasonable—inference to extract from this series of events was that Bonilla's purpose was to watch over Algarin. Although the court sustained the defendant's objection to Algarin speculating as to Bonilla's purpose, the prosecutor was nevertheless entitled to argue this point to the jury as a reasonable inference that could be drawn from the evidence admitted at trial.

F

The defendant's last claim of prosecutorial impropriety concerns the prosecutor's remark that "the next time [Algarin saw the letters] is in a proceeding with [Santiago] trying to discredit her. . . . They were trying to cash in their insurance policy." According to the defendant, no evidence was produced at trial to establish that Algarin had not seen the letters written to the defendant until a prior proceeding or that those letters were being used to discredit her at Santiago's trial. In response, the state asserts that this remark was a proper summation of Algarin's testimony. The record substantiates the state's position.

In her testimony, Algarin repeatedly stated that she

was requested to write the letters so that they could be used against her if she ever were to testify against the defendant or Santiago. By her own words, the letters were "an insurance policy to discredit me." When asked by defense counsel whether the letters were requested by the defendant, Algarin responded "[y]es, 'cause this showed up in [Santiago's] trial as insurance." The clear import from her testimony was that (1) the letters were written at the behest of Santiago and the defendant, (2) the reason why she was asked to write the letters was to provide the defendant and Santiago with means to discredit her, and (3) Algarin was confronted with the letters while testifying against Santiago at his trial. Therefore, we conclude that the defendant's claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] On March 27, 2019, this court granted the defendant's motion to dismiss the state's appeal from the trial court's dismissal of the murder charge. In the order of dismissal, this court permitted the parties to file supplemental briefing on that issue, which would be addressed in the event that the defendant were awarded a new trial. Because we affirm the judgment of conviction, we need not reach that issue.

[2] For clarity, we refer to Algarin-Santiago as Algarin.

[3] Algarin testified that the two married so that she would not be able to testify against Santiago.

[4] Algarin testified that she recognized some of these checks as Social Security checks.

[5] Santiago was frustrated that Morales had been acquitted of shooting him and was further enraged that his civil action against Morales was unlikely to result in a large monetary reward.

[6] The brothers decided to burn the checks after Algarin refused to deposit them in her account.

[7] Algarin testified that the defendant and Santiago were members of the Latin Kings, while Bonilla was a member of "Netas."

[8] Crozier had represented Algarin, the defendant, Santiago, and various family members on numerous matters prior to the 1998 murder of Morales. In fact, Crozier represented Santiago in his civil action against Morales. Crozier also testified that Algarin attempted to get away from Santiago on multiple occasions and that she stayed with Santiago because she feared him. He also stated that had Algarin gone to the police with information about the murder, "she would have definitely been murdered, based on who the people were."

[9] Algarin also wrote a series of letters to Santiago during his incarceration for an unrelated matter. These letters did not contain the sexually graphic content found in the letters she wrote to the defendant.

[10] The court would eventually dismiss the murder charge on June 9, 2017.

[11] In his brief, the defendant states, in part, that testimony of his and his brothers' gang affiliations was "irrelevant propensity" evidence. Although the defendant asserts that the state "exploited [the evidence of the defendant's gang affiliation] and used it for propensity," he concedes in his reply brief that he is not claiming such evidence would be admissible only if it fell within one of the exceptions set forth in § 4-5 of the Connecticut Code of Evidence. We therefore do not address that issue.

[12] The defendant further suggests that evidence of gang membership may be admitted only if the crime charged is related to gang activity or is probative of a defendant's motive. We believe this argument to be unavailing. First, neither of the two cases from our state cited by the defendant stands for that proposition. See *State* v. *Johnson*, 82 Conn. App. 777, 783–84, 848 A.2d 526 (2004) (trial court did not abuse its discretion in admitting evidence of gang membership to establish motive and that was further relevant to issues in case); *State* v. *Watts*, 71 Conn. App. 27, 36–37, 800 A.2d 619 (2002) (trial court did not abuse its discretion in admitting evidence of defendant's gang membership to prove motive). Second, as discussed, this court has implicitly rejected that argument. See *State* v. *Cruz*, supra, 56 Conn. App. 771–72

(no abuse of discretion in admission of testimony as to defendant's gang membership to explain delay in reporting crime, despite crime having been unrelated to gang activity).

[13] We again note that, at the hearing on the motion in limine, the court expressly stated that, "to the extent that the state is going to introduce evidence, that is, Algarin . . . was afraid to disclose this because of the defendant and/or [Santiago] was a member of the Latin Kings street gang; that they are a group of people that have access to people in many places; and that they have access to weapons, I would allow it just for that purpose. I would not allow the introduction of that evidence to go to whether [the defendant] did this crime, so I would do a limiting instruction regarding the introduction of that evidence if that comes in as an explanation for her delay in disclosing this."

[14] This evidence became particularly relevant considering Algarin's later testimony. Specifically, Algarin subsequently admitted that she did not have problems with the defendant and that the defendant had, in fact, intervened on her behalf on multiple occasions when Santiago became physically abusive. In light of this testimony, the defendant's gang affiliations became especially significant to explain why Algarin continued to fear the defendant and his cohorts despite his history of acting on her behalf.

[15] The state contends that at no point did it "[elicit] testimony that [Algarin] was in the 'witness protection program' or that she had relocated at state expense." See General Statutes §§ 54-82t and 54-82u (codifying state's protective services program for witnesses). According to the state, the only testimony elicited from Algarin on this issue was that "she and her family relocated outside of Connecticut multiple times" after she provided a statement to the police. The state fails to appreciate the implications of its use of the passive voice in its direct examination of Algarin, as the following exchange illustrates:

"[The Prosecutor]: After you gave the statement to the Waterbury police in April of 2010, you never continued to live in Waterbury, did you?

"[Algarin]: No.

"[The Prosecutor]: And in fact, you *were relocated* out of this state with your four children, correct?

"[Algarin]: Yes.

"[The Prosecutor]: And Mr. Maldonado was relocated as well, correct?

"[Algarin]: Yes.

"[The Prosecutor]: And you *were relocated* on more than one occasion, correct?

"[Algarin]: Yes." (Emphasis added.)

The state's posing of the question in the passive voice—that Algarin *was* relocated—clearly connotes that a third party, presumably the state, was actively involved in her relocation. Taking Algarin's testimony in its entirety, we conclude that evidence that Algarin *was* relocated alludes to her participation in the witness protection program.

[16] According to the court, using the phrase "witness protection program" had a "more official sound to it."

[17] To support his argument, the defendant heavily relies on *State* v. *Harris*, 521 N.W.2d 348 (Minn. 1994). However, unlike the circumstances here, the prosecutor in that case "did precisely what the *Melia* court warned against" by making the witness' participation in the witness protection program "an important focus" of her direct examination. Id., 352. Accordingly, for the same reasons that *Melia* is distinguishable here, so, too, is *Harris*.

[18] We note that the record of the court's deliberations on the relocation testimony reveals some confusion between the court and defense counsel regarding the court's observation that the defendant could use the relocation testimony in his favor. In particular, the court suggested that the defendant could cross-examine the witness on the value of relocation benefits she received as animating the witness' motivation to lie. The record indicates that, in response, defense counsel appears to confirm that he would elicit testimony, for impeachment purposes, as to how much Algarin received in state benefits as to relocation, as the following colloquy demonstrates:

"The Court: All right. Remind me, what is it—is there an objection to something at this point?

"[Defense Counsel]: Yes. I think [the prosecutor is] trying to get into the witness protection program. . . .

"The Court: And what's the objection to that evidence?

"[Defense Counsel]: Because I think it's unfair to the defendant.

"The Court: Why?

"[Defense Counsel]: Because it lends credibility to her story, which is a

story, I believe, at this point.

"The Court: Well, the truth is—again, you're subject to cross-examination. I instruct the jury when they evaluate witnesses to determine whether they have any motive to lie, whether they receive any benefit to, on one hand, you can argue they receive the benefit because they're relocated to another state. On the other hand, the state could argue that it has caused extreme disruption in their life, and so therefore, it's a lack of motive to get involved in this. So, again, I think it cuts both ways, but it's certainly relevant. I don't see that it's prejudicial to the defendant.

"[Defense Counsel]: I suspect that it is unduly prejudicial to my client.

"The Court: And why?

"[Defense Counsel]: Because it emphasizes the fact that the government agency, whether it's a state or federal, believes she is in danger and have paid money, however much money they paid for her care since the time of this so-called disclosure.

"The Court: Well there is no indication of how much they paid or anything like that.

"[Defense Counsel]: We'll certainly get into it.

"The Court: If [you do], then that's your choice. But at this point for the state to say, has your life been disrupted, obviously it shouldn't be leading questions. But what's the result of this? I had to move. I mean, I don't think the state needs to say they're in witness protection. That may be something you raise and then the state can cover that on redirect. But I had to move multiple times. Is there any reason that the state has to say, isn't it true you are in witness protection. I mean, I don't see why that might be relevant.

"[The Prosecutor]: It goes to her fear of retaliation, Judge. That's why she's in that program.

"The Court: Well, then you're asking the jury to make a conclusion. If you're saying a finding that she's in witness protection, show she's in fear, I mean, I think you can say that she had to relocate a number of times and keep her identity, her relocation safe and things like that. I don't think you need to refer to the fact that she's in the witness protection program, which is your objection anyway.

"[Defense Counsel]: Yes.

"The Court: So, I mean, I think you can go into the details of how her life has been impacted since this disclosure, the negative impacts. Obviously, the defense is aware if they want to go into details as to how much money is spent or what benefits she receives, sometimes the state could break the ice and go into that, but if there's an objection to—I guess the objection is to the finding that you're in the witness protection program. So, I think you could—I don't have a problem with the state saying at state expense, you were relocated somewhere else. I think, I guess my main concern is the use of the term witness protection program.

"[Defense Counsel]: I think by saying at state expense, it's the same thing.

"The Court: Well, I disagree. If the state wants to soften the blow of an argued motive to lie by saying that the state has paid for your expenses to be relocated or whatever, I think that that's a fair inquiry. To use the witness protection program has a more official sound to it.

"[Defense Counsel]: Your Honor, will the court entertain me; the question simply is, did you leave town.

"The Court: No. That's not the question. The issue is, why would she make this thing up. You're going to say she's making it up, the state is going to say she's not. The state is entitled to bring out how her life has changed for the worse as a result of her testifying in this case or her providing this information."

[19] Even if it were error to admit the evidence, we conclude that it was harmless error. E.g., *State* v. *Grant*, supra, 179 Conn. App. 90. The extent to which the state utilized evidence of Algarin's relocation was relatively brief. In fact, references to her relocation occurred in only two instances and were a small part of the state's case. See *State* v. *Tony M.*, 332 Conn. 810, 825–26, 213 A.3d 1128 (2019) (considering sparse references by state to improperly admitted testimony in evaluation of whether error was harmless). These sparse and infrequent references easily distinguish this matter from *Melia*, in which extensive and detailed testimony of participation in the witness protection program was highlighted by the government throughout trial. See *United States* v. *Melia*, supra, 691 F.2d 675–76; see also *United States* v. *Martino*, 648 F.2d 367, 388–89 (5th Cir. 1981) (single instance of reference to witness' participation in witness protection program was not unfair exploitation), aff'd on rehearing en banc, 681 F.2d 952 (5th Cir. 1982), aff'd sub nom. *Russello* v. *United States*, 464 U.S. 16, 104 S. Ct. 296, 78 L.

Ed. 2d 17 (1983), cert. denied, 456 U.S. 949, 102 S. Ct. 2020, 72 L. Ed. 2d 474 (1982), and cert. denied sub nom. *Lazzara* v. *United States*, 456 U.S. 943, 102 S. Ct. 2006, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Farina* v. *United States*, 456 U.S. 943, 102 S. Ct. 2006, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Russello* v. *United States*, 456 U.S. 943, 102 S. Ct. 2006, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Macaluso* v. *United States*, 456 U.S. 943, 102 S. Ct. 2007, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Scionti* v. *United States*, 456 U.S. 943, 102 S. Ct. 2007, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Morgado* v. *United States*, 456 U.S. 943, 102 S. Ct. 2007, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Fisher* v. *United States*, 456 U.S. 943, 102 S. Ct. 2007, 72 L. Ed. 2d 465 (1982), and cert. denied sub nom. *Palermo* v. *United States*, 456 U.S. 943, 102 S. Ct. 2007, 72 L. Ed. 2d 465 (1982); *United States* v. *Caliendo*, 910 F.2d 429, 435–36 (7th Cir. 1990) (three isolated references by government to witness' participation in witness protection program not reversible error).

The state additionally relied on other evidence to establish Algarin's credibility with respect to her fear of the defendant and Santiago, including evidence of Santiago's constant physical abuse of Algarin and her testimony concerning her belief that the defendant and his brothers were affiliated with nationwide gangs. This fear was further corroborated by Crozier and Roden-Timko, thus rendering the testimony complained of cumulative. See, e.g., *State* v. *Gonzalez*, 272 Conn. 515, 528–29, 864 A.2d 847 (2005) (improperly admitted evidence that is merely cumulative does not require reversal of judgment). We further note that the defendant made several attempts, through a range of topics, to undermine Algarin's alleged fear of the defendant and Santiago.

Finally, there was additional evidence corroborating Algarin's version of events, which provided a sufficient basis for the jury to conclude that Algarin was a credible witness. This included Morales' coworker confirming that on the night of Morales' death, Morales had placed the proceeds—including cash and checks—into a blue bank bag with a zipper along the top. Additionally, Crozier testified to the various details Algarin provided him with respect to the events leading to Morales' death, including the defendant's motive for committing the murder. Roden-Timko also gave a statement to the police in 2010, in which she reported that Algarin had told her that "[Santiago] and some other people were involved in a shooting and that [Santiago] made [Algarin] go with him to throw the gun into a river. . . . When [Algarin] was telling me this story, she seemed scared for her life."

Therefore, we have a fair assurance that, even if the relocation testimony was admitted in error, it did not substantially affect the verdict.

[20] We note that, although the defendant couches these claims under both his right to confrontation and his right to present a defense, the latter "has roots in the confrontation clause [of the sixth amendment to the United States constitution] and is applicable to the states through the due process clause of the fourteenth amendment . . . ." (Citation omitted.) *State* v. *Santos*, 318 Conn. 412, 422, 121 A.3d 697 (2015). For that reason, we analyze this claim under the legal principles governing our review of alleged violations of the sixth amendment. See id., 422–25 (reviewing claims of alleged violation of rights to present defense and to confrontation concerning trial court's restrictions on lines of questioning during cross-examination and introduction of extrinsic evidence).

[21] For instance, the defendant brought up instances in which Algarin had testified previously that she came downstairs with Santiago after being awakened, as opposed to Santiago yelling at her to come downstairs; how many guns she had actually seen the defendant dismantling; whether she recalled guns ever being present; that she previously testified that the money she deposited in the bank was in bags, not envelopes; and whether she could recall the specific day that she went with Santiago and Bonilla to withdraw the money from the bank.

[22] As discussed in part II B 1 of this opinion, the trial court allowed cross-examination of Algarin with respect to the letters she wrote to the defendant. The only restriction placed on this cross-examination concerned the particularly salacious content. The court did not preclude any and all inquiries into the content of the letters.

[23] Pattis testified that he believed Algarin "seemed very much to care for [Santiago]" and described their relationship as "loving . . . ." When asked if he ever had concerns that Algarin was fearful of Santiago, Pattis responded: "No. None."

[24] The content was particularly graphic in nature, especially with respect to the description of salacious acts that the two had engaged in and hoped

to engage in. Aside from the graphic content, the letters also referenced Algarin's affection for the defendant with remarks such as, "[b]aby I love you," "your picture is the first thing I look at, "I knew no matter what I could always depend on you," "my only regret is not kissing you on Burton Street," and "I love you trust I wake up to you . . . ."

The court also did not allow the defendant to introduce the letters into evidence in redacted form.

The following exchange provides context for the specific language that the defendant was allowed to recite during his cross-examination of Algarin:

"The Court: —that I haven't allowed in. It says [Bermudez] [b]aby, I love you.

"[Defense Counsel]: Yeah.

"The Court: Okay. You can ask her about that.

"[Defense Counsel]: Okay.

"The Court: You don't need to have the letter in. Didn't you say, I love you? What else in this letter is vital to the defense that I'm missing? I miss you, baby. Didn't you say, I miss you, baby?

"[Defense Counsel]: Okay. Baby, your picture is the first thing I look at.

"The Court: Go ahead, you can ask her that.

"[Defense Counsel]: You look blazing.

"The Court: You what?

"[Defense Counsel]: You look blazing.

"The Court: Whatever. . . . Those aren't what I would view as salacious comments. You can ask any question that goes to her affection toward [the defendant]."

In his closing argument to the jury, defense counsel discussed the three letters, described them as "sexually explicit," and labeled Algarin's reasoning for writing the letters "nonsense."

We also note that the appearance of some of the letters, with writing filling the entirety of the page from left to right and top to bottom, was relevant to the jury's evaluation of the letters.

The following colloquy occurred between defense counsel and Algarin:

"[Defense Counsel]: Now, after you sent those letters to [the defendant], isn't it true that [Santiago], after being with you for sixteen years, broke up with you in 2009?

"[Algarin]: That is not true.

"[Defense Counsel]: When did he break up with you?

"[Algarin]: I broke up with him because he faked a stroke in federal prison and had someone call me at work to tell me that he was dying, and that's when I called the federal penitentiary and told them I do not want any more contact with him, no phone call, no e-mail, no letter, no nothing."

Defense counsel also questioned Algarin about when her relationship with Santiago ended:

"[Defense Counsel]: [Santiago] broke up with you after the—seeing those letters?

"[Algarin]: [Santiago] and I broke up in 2008. This came out in 2010, so unless there's a time travel machine, there's no way he would of known."

Not only was the defendant entitled to cross-examine Algarin with regard to the letters she wrote to Santiago, but the court explicitly permitted the defendant to move for the admission of those letters into evidence.

Outside the presence of the jury, the defendant explained that he was seeking to cross-examine Algarin about the incident that led to the termination of her employment at Waterbury Hospital in 2004. When questioned by the court to establish how this area of inquiry was relevant, the defendant explained that in 2004, Algarin "became very upset—and disruptive on the unit where she was working in . . . Waterbury Hospital because [Santiago] was admitted to the psych ward at that time. She's claiming that . . . she's terrified of this guy, she doesn't want to be with him, but in 2004 she gets so worked up, yelling at people, being rude to people at the . . . hospital, and she's dismissed for that reason . . . ."

The court sustained the state's objection to this area of inquiry, finding that "[a]ny probative value is far outweighed by prejudicial impact. . . . It is totally irrelevant. . . . There's plenty of opportunity to probe her in the area . . . the letters, which we don't know what the dates are. She's admitted to sending money around—up to the time 2008. There's plenty of opportunity to do that. You don't need an incident in 2004 where she's fired for it. . . . I don't see how getting into whether her husband was in the psychiatric ward and she got fired is relevant here, and I can't imagine why you [questioned Algarin about it]."

Later at trial and prior to his cross-examination of Crozier, the defendant

sought the court's permission to ask Crozier about representing Algarin with respect to the termination of her employment at Waterbury Hospital. The court sustained the state's objection to the area of inquiry, finding that (1) it was irrelevant, (2) it did not go to truth and veracity, (3) even if it was relevant, its probative value was outweighed by undue prejudice, and (4) the defendant was already able to establish a positive relationship between Algarin and Santiago.

[32] Frustrated with the defendant's persistence on the matter, the court stated that "[w]e are not spending the afternoon talking about her birth control practices . . . in 1998 or 2009 or whatever we're talking about. . . . We are not spending any more time on birth control, whether she was hiding the birth control in the locker or in the bottom of her purse or wherever she was hiding it. That's it."

[33] For instance, defense counsel noted that Algarin had admitted at trial to testifying inconsistently about the number of guns she saw being dismantled in the kitchen, whether she actually saw the guns being dismantled, the date she deposited the money in the bank, the number of days that had passed before withdrawing the money from the bank, and whether she used bags or envelopes to deposit the money.

[34] During trial, defense counsel cross-examined Algarin at length about her testimony in prior proceedings. On redirect examination, the state also examined Algarin on these prior proceedings in an effort to rehabilitate her credibility with respect to her consistent testimony, with Algarin further acknowledging that she had testified in five proceedings prior to the defendant's trial.

———————————————————